Burke v. Powell, et al.                CV-94-446-M    03/13/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


John B. Burke,
     Plaintiff,

     v.                                    Civil No. 94-446-M

Ronald L. Powell, Michael J. Cunningham,
Viola J. Lunderville, Leo Kneeland,
Donald McGill, James Sokolo, Andrea
Goldberg, Joseph Guimond, and Paul McGill,
     Defendants.


**O R D E R**


     John B. Burke, currently an inmate at M.C.I. Cedar Junction
in Massachusetts, brings this civil rights action pursuant to 42
U.S.C. § 1983.  He alleges that defendants, while acting under
color of state law, deprived him of various constitutional rights
while he was incarcerated at the New Hampshire State Prison
(NHSP).  Presently before the court is defendants' motion for
summary judgment, to which Burke objects.


     The court previously dismissed some of Burke's claims.
Those that remain are as follows:  Eighth Amendment claims based
on deprivation of medical care brought against defendants Leo
Kneeland and James Sokolo; an Eighth Amendment claim based on
conditions of confinement brought against defendants Kneeland,
Joseph Guimond, Michael Cunningham, Viola J. Lunderville, Andrea
Goldberg and Donald McGill; and a claim based on an alleged
deprivation of due process brought against defendant McGill.  See
Amended Pretrial Order, Dec. 6, 1995 (Muirhead, M.J.).  The

surviving claims are asserted against defendants in their individual capacities only; all official capacity claims have been dismissed by previous order.

## BACKGROUND

After arriving at NHSP in 1991, Burke quickly distinguished himself as a disruptive and, at times, violent prisoner, amassing a lengthy disciplinary record in the process. Prior to his transfer to MCI Cedar Junction, a state correctional facility in Walpole, Massachusetts, he had been cited for numerous violations, many of them serious, including: insubordination; assaulting a staff member; threatening correctional officers; using provoking words and gestures; setting fires; damaging state property; throwing projectiles; manufacturing and possessing weapons; and causing bodily injury to another. On at least one occasion, he attacked a correctional officer, grabbed his arm, and attempted to break his wrist. When questioned about his conduct, Burke reportedly said, "I tried to break the fucker's wrist. I'm not sure if I did it, but I tried." Defendants' motion for summary judgment, exhibit 2. Not surprisingly, Burke's frequent violent and disruptive behavior resulted in several altercations with correctional officers, as a result of which he was often restrained and suffered some bruises and abrasions.

2

In August of 1991, Burke was transferred from one tier in the Special Housing Unit (SHU) at NHSP to an enhanced control unit, also located in SHU, where increased restrictions were imposed on his mobility, the amount of property he could keep in his cell, and his ability to interact with other inmates. He claims that his transfer within SHU violated his constitutional right to due process. He also claims that defendants were deliberately indifferent to his serious medical needs, thereby violating his rights under the Eight Amendment. Finally, Burke says that on several occasions one or more of the defendants used excessive force against him, again in violation of the Eighth Amendment.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling upon a party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving

3

party carries its burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect brevis disposition." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991). See also Fed. R. Civ. P. 56(e). That burden is discharged only if the cited disagreement relates to a genuine issue of material fact. Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992). "Generally speaking, a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Assoc'n of Machinists and Aerospace Workers v. Winship Green Nursing Center 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Discussion**

I.   The Eighth Amendment Claims.

Burke contends that defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. He bases his Eighth Amendment claims on (1) prison officials' alleged deliberate indifference to his serious medical and dental needs and (2) prison officials' alleged use of excessive force against him.

4

A.  Medical/Dental Mistreatment

In support of his claims regarding inadequate medical treatment, Burke alleges that nurses regularly ignored his requests for medical attention, often because they were intimidated by the behavior of correctional officers.  He says that on some occasions, officers would yell at nurses or become otherwise verbally abusive as the nurses spoke with Burke at his cell about his medical needs.

Burke also claims that in 1991, he was denied medication for headaches and other physical ailments that resulted from what he says were routine beatings by correctional officers.  In addition, he says that he was, for a period of several months, denied an adequate toothbrush and was forced to make do with one that was too small.  He also claims that he has been denied psychiatric care despite suffering from disorientation and dysfunction induced by exposure to light through the night, food deprivation, and exposure to cold.  Burke also alleges that he was denied antidepressant medication.

Aside from general and largely unsupported claims of improper medical treatment, Burke provides two specific examples of occasions when he claims to have been denied access to appropriate medical care.  In 1991, he says that as a result of defendants' failure to grant his repeated requests to see the dentist, he had to have two teeth removed.  Then, in 1994, he

5

suffered from suspected food poisoning and was seen by a nurse, who treated him but declined to refer him to a doctor.

NHSP records reveal that between August 1991 and July 1995, approximately 200 entries were made into Burke's medical records documenting his having been seen by a nurse, doctor, psychiatrist, or dentist. Burke was also referred to outside medical consultants for various medical complaints. On average, therefore, Burke was seen by medical personnel roughly once each week during his stay at NHSP.

In order to prove a claim for medical mistreatment under the Eighth Amendment, an inmate must show that prison officials demonstrated "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This test has both subjective (state-of-mind) and objective components. See DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991).

In a 1994 opinion, Justice Souter explained the state-of-mind element of deliberate indifference in the context of an Eighth Amendment claim. See Farmer v. Brennan, 511 U.S. 825, 834-847 (1994). A prison official is liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id., at 847. Nevertheless, the prisoner need not show that the defendant acted or failed to act with the intention

6

that substantial injury would actually result; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." Id., at 842. It is, however, clearly established that an Eighth Amendment medical mistreatment claim cannot be premised upon a theory of simple malpractice. The physician's conduct must go beyond mere negligence in diagnosing or treating the prisoner's medical condition. Similarly, a violation does not occur merely because a prisoner happens to disagree with a physician's decision regarding the proper course of medical treatment. See Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.").

As for the objective component of the deliberate indifference test, the prisoner must show that he or she has suffered a serious deprivation of his rights. See DesRosiers, 949 F.2d at 18. The defendant's conduct must constitute "an unnecessary and wanton infliction of pain" or otherwise be "repugnant to the conscience of mankind." Estelle, 492 U.S. at 105-106.

7

The court considers Burke's allegations in the light of these legal principles.[1]  It appears that Burke's claims for medical mistreatment are brought only against defendants Kneeland and Sokolo, both managers of Burke's unit in SHU.  Supervisors, however, cannot be held liable under § 1983 on a theory of respondeat superior (in other words, the conduct of prison employees is not automatically attributable to their supervisors).  See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).  Instead, a supervisor may be found liable "only on the basis of [his or her] own acts or omissions." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996). Accordingly, a supervisor is liable under § 1983 only when:

> (1) the conduct of [his or her] subordinates results in
> a constitutional violation and (2) the official's

---

[1]  Although Burke submitted a verified complaint (signed under the penalties of perjury) not all of his submissions (most notably his objection and his amended complaint) were submitted in a verified form, as outlined by 28 U.S.C.A. § 1746.  Moreover, Burke has neglected to file an affidavit or any excerpts from his deposition in support of his objection to summary judgment.  The affidavits that he filed previously lend little support to his claimed Eighth Amendment violations.  While certainly less than professional and likely in violation of prison policy, the conduct alleged in which the correctional officers allegedly engaged does not constitute cruel and unusual punishment.  See, e.g., Burke Affidavit, document no. 15 (chronicling arguably harassing behavior and verbal taunting alleging directed at Burke by certain correctional officers on January 8, 1995 - well after Burke filed his complaint and not the subject of this litigation.).  See also Statement of Peter Smagula, document no. 16 (same); Statement of Keith Olson, document no. 11 (same).

Nevertheless, for the purpose of resolving the motion for summary judgment, the court has treated portions of Burke's verified pleadings as the functional equivalent of an affidavit, to the extent that they are made on personal knowledge and set forth facts that would be admissible in evidence.  See Sheinkopf v. Stone, 927 F.2d 1259, 1262-63 (1st Cir. 1991).

8

action or inaction was "affirmatively linked" to that behavior in the sense that it could be characterized as "'supervisory encouragement, condonation, or acquiescence" or "gross negligence amounting to deliberate indifference."

Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988). Accord Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997) (noting that "the indifference required to support supervisory liability under section 1983 must be deliberate, reckless or callous.") (citations omitted).

Most of the allegations underlying Burke's medical mistreatment claim involve disagreements he had with medical personnel regarding the proper course of treatment he should have received. The alleged 1992 food-poisoning incident, in which a nurse refused to refer him to a doctor, is a good example — Burke's opinion about proper treatment conflicted with that of a trained nurse. That, alone, cannot support his Eighth Amendment medical mistreatment claim. The same is true of the doctor's declining to prescribe antidepressant medication. Accordingly, even assuming that defendants Kneeland and Sokolo had knowledge of these incidents, they would be entitled to summary judgment. And, even taking Burke's allegations as true, at best he asserts only some form of medical negligence or carelessness, but by no means pleads sufficient facts to support a claim that he suffered from the type of deliberately indifferent conduct necessary to support an Eighth Amendment claim.

9

Likewise, Burke's remaining contentions do not suffice to support an Eighth Amendment medical mistreatment claim. He alleges that medical personnel routinely failed to treat him after he was beaten by correctional officers, pointing to five occasions in 1992 when he was allegedly denied medication or a routine examination. However, Burke's own answers to interrogatories propounded by the defendants reveal that on many occasions following an altercation with a correctional officer he did receive medical attention. Moreover, with regard to those occasions on which he did not receive medical treatment, he does not claim that prison officials had any reason to believe that he was suffering from, or was even at risk of suffering from, any serious injury. Accordingly, defendants are entitled to summary judgment as to those claims as well.

The final basis upon which Burke rests his medical mistreatment claim is his allegation that on several occasions prison officials denied him adequate dental care. First, he claims that he was denied access to a dentist over an eight-month period in 1991 and was required to use an inadequate toothbrush, all of which eventually caused the removal of two teeth. The prison's medical records reveal that on January 10, 1991, Burke asked to see a dentist because he believed that he had a cavity and a wisdom tooth that might need to be extracted (it appears that he also complained of a chipped tooth in August of 1991, which may or may not have been treated). According to the

10

medical records, Burke had two teeth extracted on February 2, 1992.[2]  In addition, Burke had a wisdom tooth extracted on December 29, 1994, after which antibiotics and pain medication were prescribed.

There is no factual basis in the record to support either the subjective or the objective component of the deliberate indifference test.  As for the subjective component, plaintiff does not allege that defendants Sokolo or Kneeland knew of his alleged repeated requests for dental treatment.  Nor does he claim that defendants (or, for that matter, any members of the NHSP staff) were aware that he was in severe pain or at risk of substantial harm if he did not receive immediate dental treatment.

Burke's 1991 medical records show that he registered multiple complaints about various physical ailments throughout the year, including an infected tattoo on his arm, frequent headaches, bloody urine, and a painful shoulder.  Despite the documentation of Burke's numerous medical complaints, the record reveals no complaints about tooth pain or infection (aside from his initial request to see a dentist for the questionable cavity and wisdom tooth).  Medical personnel responded in an objectively

_____

[2]  Burke's medical records also indicate that he had two teeth extracted on February 2, 1993.  The court cannot discern whether one of the dates is wrong, or whether Burke in fact had two similar procedures on two different occasions.

11

reasonable fashion to Burke's complaints, even going so far as to administer an electroencephalogram (EEG) test to determine if there was a possible neurologic basis for Burke's claimed headaches, and providing him almost daily care for his infected arm. NHSP records demonstrate that medical personnel were not deliberately indifferent to plaintiff's regularly asserted medical needs during 1991. Although this evidence does not eliminate the possibility that medical personnel, while scrupulous about Burke's other difficulties, callously ignored his dental problems, it does tend to establish that defendants' subjective intent was entirely inconsistent with notions of "deliberate indifference," particularly as plaintiff has provided no evidence that suggests otherwise.

As for the objective component of the test, Burke does not claim that even he knew that he was at risk of incurring substantial harm. Cf. Gutierrez v. Peters, 111 F.3d 1364, 1373-74 (7th Cir. 1997)(holding that failure to treat an infection accompanied by excruciating pain and, at times, a high fever could result in unnecessary infliction of serious harm under Eighth Amendment). A routine and ordinary delay in having a tooth extracted, without any evidence that medical personnel had reason to suspect that such a delay would cause Burke serious harm or unnecessary serious pain does not, under these circumstances, support a claim of constitutional violation.

12

Next, the record provides no support for Burke's bare allegation that his use of an "inadequate toothbrush" caused him to have two teeth removed. Withholding items necessary to maintain adequate hygiene can, under some circumstances, amount to an Eighth Amendment violation. See, e.g. Penrod v. Zavaras, 94 F.3d 1399, 1406 (10th Cir. 1996)(reversing district court's award of summary judgment to defendants where plaintiff alleged they denied him a toothbrush over a two month period, causing bleeding gums and tooth decay). Plaintiff's only complaint here is that his toothbrush was, in his opinion, too short. Although a short toothbrush may have made brushing more difficult, there is no apparent physical reason why it could not have been used effectively for its intended purpose. And, it is not too difficult to imagine legitimate security interests that might counsel against putting a "long" toothbrush in the wrong prisoner's hands.

Finally, Burke claims that defendants violated his rights by placing the "riot team" in the dental office while he was having two of his teeth extracted. Burke claims that the presence of correctional officers made the dentist nervous and, as a result, the dentist punctured Burke's sinus cavity during the procedure. But, placing a security team in the dentist's office was perfectly appropriate if, in the judgment of trained correctional officers, it was necessary to maintain order and provide for the safety of others (e.g., the dentist). Such conduct hardly

13

qualifies as deliberate indifference to plaintiff's serious medical needs.  The presence of guards in riot gear might well make a dentist nervous, perhaps even one accustomed to working in prison surroundings, but the risk of harm to plaintiff resulting from that legitimate security measure is not sufficiently "substantial" to support a claim of deliberate indifference.

Accordingly, for the reasons set forth above, the court finds that defendants are entitled to summary judgment on plaintiff's Eighth Amendment cruel and unusual punishment claims related to alleged deliberate indifference to his serious medical needs.

B.   Excessive Force

When a prisoner claims his Eighth Amendment rights have been violated by prison officials' use of excessive force, the trier of fact must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992).  The Eighth Amendment's protections against cruel and unusual punishment apply only when a prisoner can show that he or she has been subjected to an extreme deprivation:

> Because routine discomfort is a part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.

14

Id. at 9.

Contemporary standards of decency are violated whenever a prison official uses force to maliciously and sadistically cause harm. Id. This holds true even when the prisoner has not incurred a significant injury. Id. (holding that prisoner who sustained minor bruising, swelling, loosened teeth, and a cracked partial dental plate at the hands of guards had stated excessive force claim under Eighth Amendment). However, the Eighth Amendment does not protect a prisoner from being subjected to every form of unwanted contact or physical force. Id. (Not "every malevolent touch by a prison guard gives rise to a federal cause of action."). Factors to be considered in determining whether an inmate has been subjected to excessive force, in violation of the Eight Amendment, are: (1) the need for the application of force against the inmate; (2) the relationship between that need and the amount of force actually used; (3) the extent of injury sustained by the inmate; (4) the threat to the safety of staff and inmates reasonably perceived by responsible officials; and (5) any efforts made to temper the severity of a forceful response. See Whitely v. Albers, 475 U.S. 312, 321 (1986).

Burke brings his excessive force claim (styled as a claim related to the conditions of his confinement) against Defendants Kneeland, Guimond, Cunningham, Lunderville, Goldberg, and McGill.

15

In support of that claim, Burke alleges that he was routinely strip-searched, sometimes up to ten times a day.  However, he has failed to provide even approximate dates of the alleged searches nor has he identified who might have performed those searches.  He also claims that over several weeks in 1994, officers intentionally deprived him of sleep by routinely banging his cell door with riot shields every hour through the night.  Despite his complaints to prison staff, he says, no one attempted to stop the officers.

Burke also says that correctional officers often wrenched his hand through the food slot in his cell door when he was being handcuffed, causing him to suffer severe sprains.  Along the same lines, Burke says that correctional officers would intentionally crank the cuff gates on handcuffs into his hands in order to cause him pain.  On other occasions, while escorting Burke, correctional officers would allegedly grab his handcuffs and twist them so as to inflict pain.

Neither his complaint, his amended complaint, nor his objection to defendants' motion for summary judgment specifies exactly which defendants were involved in those alleged incidents or when they occurred.  Instead, Burke provides only a vague rendition of a series of indignities he allegedly suffered over a span of years, caused by different and largely unidentified persons.  To be sure, some of Burke's allegations, if true, might

16

rise to the level of an Eighth Amendment violation. Examples include: (1) his contention that guards would purposefully over-tighten his handcuffs in order to gratuitously cause pain; (2) his claim that he was regularly beaten by guards; and (3) his allegation that he was intentionally exposed to extremely cold temperatures. See, e.g. Hudson, 503 U.S. at 12-14 (Blackmun, J. concurring)(opining that punishment in the form of intentionally exposing a prisoner to undue heat or cold should offend the Constitution).

With regard to most of his claims, however, Burke's materials are woefully inadequate in that they fail to provide critical information necessary to rebut the evidence provided by defendants and to carry his burden of, at a minimum, demonstrating that there is a genuine issue of material fact for trial. Among other things, Burke has failed to identify: (1) which defendants caused him to suffer most of the injuries he allegedly sustained; (2) the specific conduct that led to those injuries; (3) which, if any, of the named defendants actually knew what was happening to Burke and, if so, how they knew; and (4) when he suffered the alleged deprivations. Burke's responses to interrogatories propounded by defendants fail to provide any additional detail. They, like Burke's submissions, are simply a lengthy recitation of largely unspecified alleged violations of his rights and conspiratorial efforts aimed at suppressing evidence of those violations. At a minimum, Burke's allegations

17

are insufficient to raise a trial-worthy issue as to whether the named defendants violated his constitutional rights with regard to those events.

Burke does, however, identify two specific instances in which he claims excessive force was used against him.[3] The first occurred on August 24, 1991, when he claims to have been strapped to a stretcher for four hours "with straps so tight as to cause pain from diminished circulation." The following entry appears in Burke's medical records on that date:

> Saw this inmate in SHU day room he was on a restraining stretcher. Inmate had some dried blood over the area of left eye. I asked inmate if he wanted to see me and if he wanted me to attend to his medical complaints. He said no. I asked a second time and he said he did not want any medical attention while he was on this stretcher. He did however complain of losing the circulation in his hands due to the restraints. Color to both wrists and hands was good, normal in color and [the correctional officer] stated that he was able to put a pen between cuffs and skin. I advised CO to check for this at least every hour.

Defendants' motion for summary judgment, Exhibit 2. The following day, Burke was again seen by medical staff at NHSP and

---

[3] Burke also claims that between December 6 and December 11, 1994, he was subjected to unnecessary and excessive force when correctional officers: (1) pushed his face into the wall while trying to remove his handcuffs; (2) twisted his wrists and lifted his arms at an extreme angle, causing him to suffer severe pain; and (3) kneed him in the back and hit him with a body shield. Burke's Proposed Show Cause Order, document no. 10, at 4-8. However, those alleged incidents occurred well after Burke filed his complaint and are not the subject of his amended complaint. Accordingly, those complaints are not before the court in this suit.

treated for a small cut on his forehead and bruises on his arms.
Id. The record contains no reference to any injury (either
temporary or lasting) to Burke's wrist(s).

The second incident of which Burke specifically complains
occurred on December 21, 1991, when, following another violent
outburst, he was again restrained on a stretcher. The incident
report prepared following that event provides as follows:

> While assisting in an escort from SHU to the infirmary
> with inmate J. Burke, inmate J. Burke did assault Cpl.
> Martinelli by hitting him in the face with his fist.
> He was immediately taken to the floor and held there
> until the stretcher restraint arrived from SHU. He was
> placed in the stretcher restraint and transported back
> to SHU/L tier dayroom.

Incident Report, prepared by Lt. Anthony Dragon. Burke's medical
notes reveal that although he complained of a headache and
suffered "minimal bleeding" on the right side of his head
following the incident, he was alert, oriented (to the point of
directing "vulgar and abusive" language at the nurse), and
otherwise healthy.

With respect to that incident, Burke makes the following
claims:

> Plaintiff notes a 12-31-91 incident report stating that
> plaintiff assaulted a guard. What is not noted is that
> plaintiff was handcuffed and shackled at the time and
> plaintiff was beaten by all guards and supervisory
> [personnel] present, in front of approximately 100
> inmates. Fact.

19

> The stretcher restraint was used as a form of punishment/<u>torture</u>.  What is not noted is the effects of the restraints over extended periods of time.

Plaintiff's memorandum at 17 (emphasis in original).  Burke does not dispute the fact that he assaulted the correctional officer nor has he provided the court with affidavits (or even statements) of any of the "approximately 100 inmates" who allegedly witnessed this event.  Nor has he otherwise refuted defendants' claim, which is supported by the record, that the force applied to him in an effort to end his assault upon the correctional officers was reasonable and necessary and applied in a good faith effort to restore order.  <u>See</u> <u>Hudson</u>, 503 U.S. at 7.

While plaintiff casually employs the term "beaten," he provides no factual allegations (e.g., nature of striking, degree and type of injuries, duration, etc.) that might refute the uncontested fact that he attacked an officer and had to be physically overpowered and restrained.  Plaintiff might consider that scuffle to have been a "beating," but the limited use of force reasonably necessary to subdue an assaultive inmate does not contravene the Eighth Amendment.  As the Supreme Court has observed:

> It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. <u>The infliction of pain in the course of a prison security measure, therefore, does</u>

20

> not amount to cruel and unusual punishment simply
> because it may appear in retrospect that the degree of
> force authorized or applied for security purposes was
> unreasonable, and hence unnecessary in the strict
> sense.
>
> * * *
>
> Where a prison security measure is undertaken to
> resolve a disturbance, such as occurred in this case,
> that indisputably poses significant risks to the safety
> of inmates and prison staff, we think the question of
> whether the measure taken inflicted unnecessary and
> wanton pain and suffering ultimately turns on whether
> force was applied in a good faith effort to maintain or
> restore discipline or maliciously and sadistically for
> the purpose of causing harm.

Whitley, 475 U.S. at 319-21 (emphasis supplied) (citation

omitted). Here, the record is devoid of evidence which might

reasonably suggest that defendants used force and inflicted pain

upon Burke "maliciously and sadistically," rather than simply in

a good faith effort to subdue him and control his outbursts. As

the court of appeals has observed:

> Summary judgment is not automatically precluded even in
> cases where elusive concepts such as motive or intent
> are at issue. If the non-moving party rests merely
> upon conclusory allegations, improbable inferences, and
> unsupported speculation, summary judgment may be
> appropriate even where intent is an issue.

DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)

(citations and internal quotation marks omitted).

In the end, Burke has failed to provide the court with any

materials (e.g., citations to the record, affidavits, verified

pleadings, witness statements, deposition testimony, etc.) upon

21

which it might rely in concluding that there is a genuine issue of material fact which might preclude the entry of judgment as a matter of law in favor of defendants with regard to those claims. See Fed. R. Civ. P. 56; 28 U.S.C. § 1746. See also Whitley, 475 U.S. at 322 (holding, in the context of a motion for directed verdict, that "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.").

Burke's claims that one or more defendants violated his Eight Amendment rights by maliciously and sadistically inflicting pain upon him are conclusory and unsupported by the record. At best, one might be able to craft an argument that Burke has stated a claim for some form of common-law tort. He has not, however, provided the court with any support for the assertion that defendants' conduct even approached the level of egregiousness and maliciousness necessary to constitute a violation of the Cruel and Unusual Punishment Clause of the Eight Amendment.

Violent and disruptive inmates who attack correctional officers can expect to suffer some injuries during the ensuing efforts to subdue them. However, merely pointing to those injuries and making the unsupported, conclusory assertion that

22

they were the product of excessive force is, without more, insufficient to support a cause of action under section 1983 for a violation of the Eighth Amendment. See generally Whitley, 475 U.S. at 319-21. At a minimum, the inmate must demonstrate that a trier of fact could reasonably conclude that those injuries were the product of malicious and sadistic conduct by one or more of the defendants. See DeNovellis, 124 F.3d at 306 ("Once the moving party has properly supported [its] motion for summary judgment, the burden shirts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.") (citations omitted). Burke has failed to carry that burden.

II.  Due Process Claims.

Finally, Burke asserts that Defendant Donald McGill, a Lieutenant on duty in the Special Housing Unit (SHU) at NHSP, deprived him of liberty without due process of law in violation of the Fourteenth Amendment. This claim is primarily based upon (1) Burke's transfer from one tier within SHU to the enhanced control unit within SHU and (2) prison officials' alleged violations of state regulations and written prison policies in connection with that transfer.

Under some circumstances, states may create liberty interests that are protected by the Due Process Clause. Sandin v. Conner, 515 U.S. 472, 483-484 (1995). However,

23

constitutionally protected interests are generally limited to freedom from restraints that "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. So, for example, a sudden transfer to a mental institution, or involuntary administration of psychotropic drugs, might exceed the hardships ordinarily associated with a prisoner's sentence to such a degree as to give rise to a constitutional violation. However, the Supreme Court has held that merely disciplining an inmate by subjecting him to segregated confinement for thirty days is the type of action falling well within the expected boundaries of an inmate's sentence and, therefore, does not implicate a protected liberty interest. Id. at 486; see also Dominique v. Weld, 73 F.3d 1156, 1159-60 (1st Cir. 1996)(holding that prisoner transferred from work-release to a medium security facility had no liberty interest such that he was entitled to due process before the work-release privilege was revoked). After Sandin, unless an inmate has been subjected to an "atypical hardship," it is unlikely that he or she will prevail on a claim premised upon an internal prison transfer or status change. See Dominique, 73 F.3d at 1160.

Burke's assignment from one tier in SHU to another for disciplinary purposes did not dramatically depart from the basic conditions of his sentence and resulted in no violation of his cognizable liberty interests, even if prison officials somehow

24

violated state regulations or written prison policies applicable to such transfers. Although the transfer may have imposed an increased hardship on Burke, any such burden did not go beyond what one would ordinarily expect in a unit designed to control violent and disruptive inmates who pose substantial risks to safety or orderliness in the prison. Accordingly, Defendant McGill is granted summary judgment on plaintiff's due process/liberty interest claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (document no. 52) is granted. The Clerk of Court is instructed to enter judgment in accordance with this order and close the case.


**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 13, 1998

cc:  John B. Burke
     Daniel J. Mullen, Esq.
     Stephen J. Judge, Esq.

25